1  KAREN P. HEWITT
   United States Attorney
2  JOSEPH J.M. ORABONA
   Assistant U.S. Attorney
3  California State Bar No. 223317
   Federal Office Building
4  880 Front Street, Room 6293
   San Diego, California  92101-8893
5  Telephone: (619) 557-7736
   Email: joseph.orabona@usdoj.gov
6
   Attorneys for Plaintiff
7  United States of America

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10  UNITED STATES OF AMERICA,        )    Criminal Case No. 08CR1166-W
                                     )
11              Plaintiff,           )    Date:   June 24, 2008
                                     )    Time:   9:00 a.m.
12        v.                         )    Place:  Courtroom 7
                                     )
13  FELIX HERNANDEZ-CHAVEZ (1),      )    The Honorable Thomas J. Whelan
    HUGO MONTES-MARTINEZ (2),        )
14  MODESTA LUISA MAGANA (3),        )    **UNITED STATES' RESPONSE IN**
    JUAN JESUS LIMON (4),            )    **OPPOSITION TO DEFENDANTS'**
15                                   )    **MOTIONS TO**
                Defendants.          )
16                                   )    **(A)  DISMISS INDICTMENT UNDER**
                                     )        ***COUNTY OF RIVERSIDE***
17                                   )    **(B)  SUPPRESS STATEMENTS;**
                                     )    **(C)  SUPPRESS THE ILLEGAL FRUITS**
18                                   )        **OF DEFENDANTS' ARREST;**
                                     )    **(D)  SEVER CO-DEFENDANTS;**
19                                   )    **(E)  SEVER COUNTS;**
                                     )    **(F)  COMPEL DISCOVERY AND**
20                                   )        **PRESERVE EVIDENCE;**
                                     )    **(G)  JOINDER; AND**
21                                   )    **(H)  FILE FURTHER MOTIONS;**
                                     )
22                                   )    **TOGETHER WITH STATEMENT OF**
                                     )    **FACTS, MEMORANDUM OF POINTS AND**
23  _____      )    **AUTHORITIES**

24        The plaintiff, UNITED STATES OF AMERICA, by and through its counsel, Karen P. Hewitt,

25  United States Attorney, and Joseph J.M. Orabona, Assistant United States Attorney, hereby files its

26  Response in Opposition to Defendants' above-referenced Motions.  This Response in Opposition is

27  based upon the files and records of the case, together with the attached statement of facts and

28  memorandum of points and authorities.

# I

## STATEMENT OF THE CASE

On April 15, 2008, a federal grand jury in the Southern District of California returned a one-count Indictment against Defendant Felix Hernandez-Chavez ("Defendant Hernandez"). The Indictment charges Defendant Hernandez with one count of possessing approximately 86.75 kilograms (191.25 pounds) of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). On April 15, 2008, Defendant Hernandez was arraigned on the Indictment and entered a plea of not guilty. On June 4, 2008, a federal grand jury in the Southern District of California returned a two-count Superseding Indictment against Defendants Hernandez, Hugo Montes-Martinez ("Defendant Montes"), Modesta Luisa Magana ("Defendant Magana"), and Juan Jesus Limon ("Defendant Limon). Count One of the Superseding Indictment charges Defendants Hernandez and Montes with possessing approximately 86.75 kilograms (191.25 pounds) of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Count Two of the Superseding Indictment charges Defendants Montes, Magana, and Limon with possessing 50 kilograms or more, to wit, approximately 105.40 kilograms (231.89 pounds) of marijuana, with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

On June 9, 10, and 11, 2008, Defendants Limon, Montes, and Magana filed discovery motions, motions to dismiss the indictment, motions to suppress statements, motion to sever counts, motion to sever defendants, and motions for joinder. The United States hereby files the following response in opposition to these motions.

# II

## STATEMENT OF FACTS

### A.    OFFENSE CONDUCT ON MARCH 14, 2008

#### 1.    Events Leading to Seizure of Marijuana

On March 14, 2008 at approximately 7:15 p.m., U.S. Border Patrol Agent Clark was performing his official duties at the S-2 checkpoint near Ocotillo, California. At that time, a 2005 red Ford F-150 pickup truck, with New Mexico license plate number "147NGJ," approached the inspection area with two visible occupants. Agent Clark asked Defendant Hernandez, the driver of the truck, and the passenger, Defendant Montes, to state his citizenship. Agent Clark noticed that the rear seats of the

truck were lifted and he saw two large bundles underneath the seats. Agent Clark continued to talk with the occupants of the truck, when Agent Santana found another large bundle, partially concealed, in the bed area of the truck. Defendant gave Agent Clark consent to search the truck. Clark seized all three of the large bundles, contained a green, leafy substance that appeared to marijuana. The three large bundles appeared to be improvised backpacks wrapped in green nylon. The three large bundles weighed approximately 86.75 kilograms (191.25 pounds). Border Patrol agents also found a Google satellite map, which depicted the Shockey Truck Trail area. An "X" was marked on the Shockey Truck Trail, and a circle mark "O" was placed just south of Calle Loreto and Las Montanas. Defendants Hernandez and Montes were arrested and transported to station for processing.

### 2.    Defendant Hernandez's Post-Miranda Statements

At approximately 12:15 a.m., on March 15, 2008, DEA Agent Butler advised Defendant Hernandez, in the Spanish language, his Miranda rights, using a DEA-13B Card. Defendant Hernandez acknowledged that he understood his Miranda rights, and he agreed to waive those rights and speak with the agents without the presence of counsel.

Defendant Hernandez admitted that he was hired by a man he knew as "Guero," who agreed to pay Defendant Hernandez approximately 3,000 pesos to transport three "suitcases" from Calexico to El Cajon. Defendant Hernandez did not question "Guero" about the contents of the "suitcases," but he thought the "suitcases" contained something bad. Defendant Hernandez described the strong odor inside the cab of the truck as similar to alfalfa. Defendant Hernandez admitted knowing his passenger, Defendant Montes, for approximately three weeks. Defendant Hernandez said Defendant Montes was riding with him because Defendant Hernandez was unfamiliar with the area and Defendant Montes knew how to drive from Calexico to El Cajon.

### 3.    Defendant Montes' Post-Miranda Statements

At approximately 12:45 a.m., on March 15, 2008, DEA Agent Butler advised Defendant Montes, in the Spanish language, his Miranda rights, using a DEA-13B Card. Defendant Montes acknowledged that he understood his Miranda rights, and he agreed to waive those rights and speak with the agents without the presence of counsel.

/ /

1   Defendant Montes said he was contacted by his uncle in Mexicali, Mexico, to come to Mexico

2   and work at a palm tree farm.  Defendant Montes traveled from Borrego Springs, California, to Tecate,

3   Mexico, where he took the bus to Mexicali, Mexico.  Defendant Montes called his uncle from a gas

4   station in Mexicali, and his uncle told him he did not need his help.  Defendant Montes said his uncle

5   advised him to look for a ride back to Borrego Springs.  Defendant Montes then met Defendant

6   Hernandez, and Defendant Montes stated that he was given a ride by Defendant Hernandez, who he

7   claimed he never met before, from Mexicali, Mexico, to Borrego Springs, California.  When Defendant

8   Montes got into Defendant Hernandez's truck, Defendant Montes said he could smell a strong odor of

9   marijuana.

10   **4.    Contents of the Three Bundles**

11   Border Patrol agents noticed that the three bundles contained a green, leafy substance that, based

12   on their training and experience, appeared to be marijuana.  On March 15, 2008, DEA Agent Butler, as

13   witnessed by DEA Agent Camacho, field-tested the green, leafy substance in the three large bundles,

14   and the substance tested positive for marijuana.

15   **B.    OFFENSE CONDUCT ON MAY 8, 2008**

16   **1.    Events Leading to Seizure of Marijuana**

17   On May 8, 2008, Border Patrol agents were conducting anti-smuggling operations targeting the

18   Shockey Truck Trail, which is located 13 miles east of Tecate, California Port of Entry, is a notorious

19   smuggling corridor for illegal aliens and narcotics, and spans 6 miles from California State Route 94

20   to the United States/Mexico international border.

21   At approximately 9:00 a.m., Border Patrol Agent P. Robinson observed a burgundy Nissan

22   Maxima ("Maxima") approach the intersection of Route 94 and Shockey Truck Trail.  The driver of the

23   Maxima honked three times and turned down the Shockey Truck Trail.  Shortly thereafter, a green

24   Chevrolet Malibu ("Malibu") approached the same intersection and turned down the Shockey Truck

25   Trail.  Agent Robinson observed the passengers from the Malibu and Maxima switch vehicles.  Agent

26   Robinson also observed that the windows of the driver side of the Malibu and Maxima were down and

27   Agent Robinson could hear the occupants of the two cars speaking to each other.  Agents observed the

28   Maxima and Malibu exit the Shockey Truck Trail and leave the area via Route 94.

At approximately 9:45 a.m., Agent M. Saclarides observed the Malibu traveling again on Route 94 and enter the Cameron Corners strip mall and park. Agent Saclarides requested a records check on the license plate of the Malibu. Agent Saclarides learned that the car was registered to "Viviana Magana." Agent Miele notified other Border Patrol agents that "Viviana Magana" was a known registrant of a prior smuggling vehicle.

At approximately 10:25 a.m., Agent Robinson observed the Malibu, which was driven by a female, again turned off of Route 94 and onto the Shockey Truck Trail. Agent Robinson observed the car stop, the passenger exit the car, walk to the front of the car, and yell loudly. The passenger got back into the car and the car continued south on the Shockey Truck Trail out of Agent Robinson's sight.

At approximately 10:40 a.m., Agent Robinson observed the Malibu traveling north on the Shockey Truck Trail toward Route 94. Agent Robinson saw two visible occupants in the car – a male driver and female passenger. The Malibu passed by Agent Miele and he followed the car along Route 94. Based on the totality of the circumstance – the Border Patrol agents' knowledge that the Shockey Truck Trail is used for illegal aliens and narcotics smuggling, the stopping of the cars and honking in a known smuggling corridor, the tandem driving and communication between the Maxima and Malibu, the recognition that the registered owner of the Malibu was a known registrant of a smuggling vehicle, and the fact that the car appeared heavier in the rear despite having only two visible occupants – Agent Miele believed the Malibu was transporting concealed illegal aliens and requested a marked Border Patrol vehicle to pull over the Malibu.

At approximately 10:55 a.m., Agent E. Pepe activated his emergency lights and sirens and the Malibu yielded along Route 94. Agent Pepe observed that the Malibu was driven by a male, later identified as Juan Jesus Limon, and had a female passenger in the front seat, later identified as Modesta Luisa Magana, and a male passenger slouched in the rear seat, later identified as Hugo Montes-Martinez. Defendant Limon told Agent Pepe that there was no one in the trunk and gave consent to search the trunk. Border Patrol agents found two large improvised backpacks and smelled a powerful odor of marijuana. Each backpack, one green nylon mesh and one red, white and blue checkered nylon, contained several individual packages wrapped in tan packaging tape. Nine packages were removed from the two backpacks, which weighed approximately 47.10 kilograms (103.61 pounds). Agents confirmed that the substance in the backpacks was marijuana.

1    Border Patrol agents also searched the interior of the Malibu.  Border Patrol agents found a key

2  ring with a Nissan key on the seat where Defendant Magana was sitting in the Malibu.  Border Patrol

3  agents located the burgundy Nissan Maxima that had been spotted earlier that morning with the Malibu

4  in the parking lot at the Golden Acorn Casino.

5    Border Patrol agents also found a Google satellite map, which depicted the Shockey Truck Trail

6  area and had a route marked in blue ink pen leading south on the Shockey Truck Trail to Calle Loreto,

7  then breaking east to Las Montanas.  An "X" was marked in the brush south of Las Montanas near a

8  wooden gate.  Agents, utilizing narcotics detector dogs, searched the area depicted on the map, and

9  found two more large improvised backpacks, similar to the ones recovered from the trunk of the Malibu,

10  in the brush.  One of the backpacks was made of the same green nylon mesh as the one found in the

11  Malibu.  Both backpacks also had a strong odor of marijuana and contained a green, leafy substance.

12  These two large backpacks contained ten individual packages, which weighed approximately 57.30

13  kilograms (128.28 pounds).  Agents confirmed that the substance in the backpacks was marijuana.

14    Through further investigation, agents determined that the Malibu was registered to "Viviana

15  Magana," who is the sister of Defendant Magana.  In March 2007, Border Patrol agents arrested Viviana

16  Magana in the Malibu for transporting approximately 110.45 kilograms (243 pounds) of marijuana.  In

17  addition, agents determined that the Maxima was registered to "Queena Rapaela Limon," who is related

18  to Defendant Limon.

19    **2.    Statements Made by Defendants to Each Other While in Custody**

20    On May 8, 2008, at approximately 11:50 a.m., while Defendants Montes, Magana, and Limon

21  were held at the San Ysidro Resident Office lock-up area, agents overheard a conversation between

22  Defendants.  Defendant Limon told Defendant Magana that Defendant Montes "needs to do the right

23  thing."  Defendant Limon suggested to Defendant Magana that they "throw it all on Hugo [Montes]."

24  Defendant Magana responded, "Right."  Defendant Limon said, "Sounds like a plan."  Defendant

25  Magana told Defendant Limon that if she "stayed at the ranch, [they] would not be here, because [she

26  didn't] think [Defendant Limon] would have it."

27  //

28  //

At approximately 12:10 p.m., Defendant Limon asked Defendant Montes whether he smoked marijuana, and Defendant Montes said "yesterday." Defendant Magana then said that she planned to smoke some marijuana once she gets home. Defendant Limon said, "Don't worry about it, we're gonna go home . . . watch."

### 3.    Defendant Limon's Post-Arrest Statements

On May 8, 2008, at approximately 3:23 p.m., DEA Agent J. Pokryfke advised Defendant Limon of his <u>Miranda</u> rights, using a DEA-13A Card. Defendant Limon acknowledged that he understood his <u>Miranda</u> rights, and he agreed to waive his rights and speak with the agents without an attorney.

Defendant Limon admitted he was involved in the transportation of marijuana that was seized earlier that day. Defendant Limon received a call from Defendant Magana's stepfather "Beto" asking him to drive to the area of the Golden Acorn Casino and follow Defendant Magana back to San Diego because Defendant Magana would be transporting marijuana in her car. "Beto" offered to pay $1,000.00 to Defendant Limon to follow Defendant Magana back to San Diego. Defendant Limon met Defendant Magana near State Route 94 and the Shockey Truck Trail, and they tried to find the marijuana. Having no luck and running low on gas, Defendant Limon drove his Maxima to the Golden Acorn Casino and parked it. Defendant Limon got in Defendant Magana's Malibu and they drove back to the Shockey Truck Trail. Defendant Limon said he used the Google satellite map that was found in the Malibu to locate the pickup point of the marijuana. Defendant Limon said several unknown Hispanic males attempted to load the marijuana in the trunk of the Malibu, but there was not enough room for all of the marijuana to fit in the trunk.

### 4.    Defendant Magana's Spontaneous Statements

On May 8, 2008, at approximately 4:21 p.m., DEA Agent Pokryfke advised Defendant Magana of her <u>Miranda</u> rights, using a DEA-13A Card. Defendant Magana acknowledged that she understood her <u>Miranda</u> rights, and she invoked her rights not to speak with agents without an attorney.

Agent Pokryfke did not ask Defendant Magana any incriminating questions. Agent Pokryfke proceeded to ask biographical questions only. During the biographical questioning, Agent Pokryfke asked Defendant Magana about her tattoos. Defendant Magana showed Agent Pokryfke a tattoo of hands praying just above her right knee. Defendant Magana and Agent Pokryfke got into a brief

discussion of religion and being honest. Agent Pokryfke told Defendant Magana that after she had a chance to speak to her attorney and if she decided to tell her side of the day's events, she should tell the truth. Defendant Magana said she would be honest, and then added that the only reason she "did this was because [she had] tickets to pay off." Agent Pokryfke did not respond to her comment.

## 5. Defendant Montes' Post-Arrest Statements

On May 8, 2008, at approximately 4:36 p.m., Border Patrol Agent J. Roa-Zempoal advised Defendant Montes, in the Spanish language, his <u>Miranda</u> rights, using a DEA-13B Card. Defendant Montes acknowledged that he understood his <u>Miranda</u> rights, and he agreed to waive those rights and speak with the agents without the presence of counsel.

Defendant Montes said he received a phone call from "El Beto," who told Defendant Montes he need him to assist two individuals in picking up a load of marijuana near Campo. Defendant Montes was driven to a gas station in Cameron Corners strip mall, where he met Defendants Limon and Magana. Defendant Montes got into the Malibu and began guiding them to an area where he had previously picked up marijuana. Defendant Montes said they traveled on the Shockey Truck Trail to a dirt road and stopped near a broken down vehicle. Defendant Montes said two individuals came out of the brush and mentioned Defendant Magana's name. Once her identity was confirmed, the two individuals loaded the marijuana into the trunk of the Malibu. Defendant Montes added that he was also supposed to fill up the Maxima, parked at the Golden Acorn Casino, with gas and drive it back to San Diego. Defendant Montes said the marijuana was to be delivered to Escondido, where an individual would pay the load drivers their smuggling fee.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

### III

**THE UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS
ALONG WITH MEMORANDUM OF POINTS AND AUTHORITIES**

A.      **THE COURT SHOULD DENY THE MOTION TO DISMISS THE INDICTMENT**

1.      **There Was No Pre-Arraignment Delay**

Under Federal Rule of Criminal Procedure 5(a), an "officer making an arrest . . . without a warrant should take the arrested person without unnecessary delay before the nearest available federal magistrate." See Mallory v. United States, 354 U.S. 449 (1957) (indicating that the purpose of Rule 5(a) is to prevent oppressive police interrogations and other third-degree tactics before bringing the defendant in front of an officer of the court; the remedy was exclusion of evidence which had been gained during the delay by use of such tactics). The Supreme Court has analyzed the term "delay" in the context of the safe harbor under 18 U.S.C. § 3501, and its reasoning can be applied the term "delay" in Rule 5(a). See United States v. Alvarez-Sanchez, 511 U.S. 350, 357-360 (1994). In Alvarez, the defendant was arrested and booked on state narcotics charges and spent the weekend in state custody. Id. at 352. On Monday morning, the state officers notified federal agents that defendant had counterfeit currency. Id. While in state custody, defendant made inculpatory statements to federal agents. Id. The Court addressed whether there was any impermissible delay. The Court held:

> To delay is '[t]o postpone until a later time' or to 'put off an action'; a delay is a postponement. The term presumes an obligation to act. Thus, there can be no 'delay' in bringing a person before a federal magistrate until, at a minimum, there is some obligation to bring the person before such a judicial officer in the first place. Plainly, a duty to present a person to a federal magistrate does not arise until the person has been arrested for a *federal* offense...Until a person is arrested or detained for a federal crime, there is no duty, obligation, or reason to bring him before a judicial officer 'empowered to commit persons charged with offenses against the laws of the United States,' and therefore, no 'delay'...can occur.

Id. at 357-358 (citations omitted) (emphasis in the original). When a person is arrested and held only on state charges, even if the arresting officers believe or have cause to believe that the person also may have violated federal law, the requirements set forth in Rule 5(a) are not triggered because there is no federal charge pending. See id. at 358 (noting that a state officer's belief that the person he arrested may have violated a federal law does not alter the underlying basis for the arrest and subsequent custody; many activities are criminalized under both state and federal law).

08CR1166-W

Here, agents arrested Defendants Montes, Magana and Limon on May 8, 2008 and booked Defendants into state custody on state narcotics charges. After further investigation of Defendants, agents learned that Defendant Montes had recently been arrested in March 2008 in the same area for being involved in a similar marijuana smuggling event and was subsequently charged with a federal narcotics charge. On May 9, 2008, federal agents contacted the U.S. Attorneys Office in the Southern District of California to discuss whether federal charges should be brought against these three Defendants. On May 12, 2008, the United States presented a complaint charging Defendants Montes, Magana, and Limon with federal narcotics violations to the Honorable Cathy A. Bencivengo. Magistrate Judge Bencivengo made a probable cause determination and signed the complaint and three federal arrest warrants for Defendants Montes, Magana, and Limon. On May 13, 2008, federal agents executed the three federal arrest warrants (which are available on the ECF docket report and have been produced to Defendants in discovery (bates numbers 64-66)) and booked Defendants Montes, Magana, and Limon into federal custody at the Metropolitan Correctional Center (MCC). On May 14, 2008, Defendants Montes, Magna, and Limon made their initial appearance before Magistrate Judge Bencivengo. As such, not more than 48 hours had elapsed since the filing of federal charges and the initial appearance of Defendants. Consistent with the Supreme Court's holding in <u>Alvarez-Sanchez</u>, the time that Defendants spent in state custody on state charges only does not trigger Rule 5, and therefore, is not counted in determining whether Defendants were taken without unnecessary delay to the nearest federal magistrate. Thus, the Court should deny Defendants' motion to dismiss the indictment because there was no violation of Rule 5 or the Supreme Court's holding in <u>County of Riverside</u>.

Defendants also contend that they remained in custody (both state and federal) for six days without a probable cause determination because state and federal agents were in collusion. [Def. Magana's Motions at 4.] The Supreme Court held that a confession obtained where state or local authorities arrested and detained someone in order to allow federal agents to interrogate him in violation of his rights must be suppressed if the defendant can demonstrate the existence of improper collaboration between federal and state or local officers. <u>Alvarez-Sanchez</u>, 511 U.S. at 359 (citing <u>Anderson v. United States</u>, 318 U.S. 350 (1943)). The defendant has the burden to prove the existence of such actual collaboration. <u>United States v. Michaud</u>, 268 F.3d 728, 734 (9th Cir. 2001). "A bare

1   suspicion that there was collaboration between the two agencies designed to deny fundamental rights

2   is not sufficient." United States v. Doe, 155 F.3d 1070, 1078 (9th Cir. 1988) (en banc) (quoting United

3   States v. Leeds, 505 F.2d 161, 163 (10th Cir. 1974)).

4          Here, Defendants fail to meet their burden of proof.  The bare assertion that state and federal

5   officials were in collusion is insufficient.  Moreover, each of the Defendants was advised of his or her

6   Miranda rights by federal agents within six hours of his or her arrest.  As such, there was no delay.

7   Thus, the Court should deny Defendant's motion to dismiss the indictment.

8                 **2.      The Court Should Not Dismiss the Indictment Nor Suppress Evidence**

9          The Supreme Court has not spoken on what is the appropriate remedy is for a failure promptly

10  to determine probable cause as to an arrestee.  See County of Riverside v. McLaughlin, 500 U.S. 44,

11  56 (1991) (holding that "judicial determinations of probable cause within 48 hours of arrest will, as a

12  general matter, comply with the promptness requirement of Gerstein.").  However, it is well settled that

13  a McLaughlin violation arises from the Fourth Amendment. See id. at 47; Gerstein v. Pugh, 420 U.S.

14  103, 125 (1975).  Although suppression of evidence has been a preferred remedy for a Fourth

15  Amendment violation, see Brown v. Illinois, 422 U.S. 590 (1975), it is not the automatic remedy for any

16  such violation.  See United States v. Studley, 783 F.2d 934, 936 n.2 (9th Cir. 1985) (holding that

17  suppression of evidence obtained during the unreasonable delay is an appropriate remedy for violations

18  of Rule 5(a)).

19         Dismissal of an indictment is a drastic remedy.  One Ninth Circuit case briefly addressed the

20  question of dismissal of an indictment as a potential remedy for failing to timely bring a defendant

21  before a magistrate.  In United States v. Jernigan, 582 F.2d 1211, 1214 (9th Cir. 1978), the court stated

22  in dicta that dismissal might be an appropriate remedy for an untimely arraignment in certain

23  circumstances.  There, Rule 9(c)(1) was at issue.  Although the same analysis applies, Jernigan is

24  distinguishable.  In Jernigan, the appellate court found that an agent deliberately waited to arrest a

25  defendant in order to avoid going before a magistrate, avoid a bail hearing, and avoid release of the

26  defendant.  Id.  Even under those circumstances, the appellate court declined to invoke the extreme

27  remedy of dismissal of the indictment given the absence of any prejudice beyond a few days of

28  incarceration.  Id.

1    In determining whether to suppress evidence and, presumably, whether to dismiss a complaint

2  or indictment, courts must consider the reasons for the delayed arraignment.  The crucial factor in

3  determining whether a delay was necessary is not the amount of time elapsed between the arrest and

4  confession, but the nature of the police activity during the delay.  See Smith v. United States, 390 F.2d

5  401 (9th Cir. 1968).

6    As noted above, there was no pre-indictment delay because federal charges were not pending

7  until May 12, 2008.   As such, less than 48 hours elapsed between Defendants' arrest on the federal

8  charges and the probable cause determination of the federal charges.  Unlike in Jernigan, no evidence

9  exists that the agent delayed an arraignment in order to avoid bail, to avoid Defendant's release, or to

10  further the investigation.  The delayed probable cause determination in no way affected the investigation

11  against Defendant.  The statements obtained by the agents from Defendants were obtained within six

12  hours of each Defendants' arrest, and were not the result of any delayed probable cause determination.

13  Nothing about the probable cause determination impacted Defendants' ability to prepare a defense.

14  Thus, Defendants' mischaracterization of the facts to create an aura of governmental misconduct is

15  unfounded. Accordingly, no evidence should be suppressed and the Superseding Indictment should not

16  be dismissed.

17    **B.    THE COURT SHOULD NOT SUPPRESS DEFENDANTS' STATEMENTS AS AN ALTERNATIVE REMEDY TO DISMISSING THE INDICTMENT**

18
19    Defendants move the court to suppress statements or dismiss the indictment for a warrantless

20  arrest, failure to submit arrest to magistrate, and unnecessary delay in the initial appearance. [Def.

21  Magana's Motion at 4-5.] As discussed above, the United States has demonstrated that no such failure

22  to submit to a federal magistrate occurred and, therefore, there was no delay.  With regard to

23  Defendants' claim that a warrantless arrest occurred, Defendants fail to acknowledge that three federal

24  arrest warrants were obtained on May 12, 2008 and executed on May 13, 2008. [See docket nos. 2, 3,

25  4 in 08CR1166.]

26    Section 3501 guides the court in determining whether pre-arraignment statements obtained in

27  violation of Rule 5(a) are admissible.  United States v. Van Poyck, 77 F.3d 285, 288 (9th Cir. 1996).

28  As explained by 18 U.S.C. § 3501(c), statements voluntarily made by a defendant within six hours of

the arrest "shall not be inadmissible solely because  of delay in bringing such a person before a

12                                          08CR1166-W

magistrate." The "safe harbor" period extends beyond the six hour mark if the delay is reasonable and due to the "means of transportation and the distance to be traveled to the nearest available magistrate . . . ." Van Poyck, 77 F.3d at 288 (citation omitted). This Ninth Circuit has articulated two tests to determine whether non-safe harbor statements made during pre-arraignment delay are inadmissible under Rule 5(a): (1) whether the delay was reasonable; and (2) whether the delay violates a public policy concern, such as discouraging officers from unnecessarily delaying arraignments, preventing admission of involuntary confessions, and encouraging early processing of defendants. See Van Poyck, 77 F.3d at 288-89. The Court has avoided choosing between these two tests, determining that statements are either admissible or inadmissible under either test. See id. at 290 (holding that pre-arraignment statements are admissible under either test).

As set forth below, Defendants' statements are admissible under either test. There was no pre-arraignment delay, and public policy concerns do not weigh in favor of suppression of Defendants' post-arrest statements.

### 1.    There Was No Pre-Arraignment Delay

Defendants argue that law enforcement agents deliberately detained him or her at a state facility without taking him to a federal magistrate in a timely manner. This is simply not true. Defendants were not taken immediately to a federal magistrate because Defendants were booked into custody on state, not federal, narcotics charges. As stated above, Judge Bencivengo made a probable cause determination on May 12, 2008 and signed the federal arrest warrants for Defendants Montes, Limon and Magana. Defendants made their initial appearance on May 14, 2008. As such, there was no pre-arraignment delay. Thus, the Court should deny Defendants' motion to suppress statements.

### 2.    Public Policy Concerns Are Not Implicated

Federal agents with the U.S. Border Patrol arrested Defendants Montes, Magana, and Limon, and turned them over to federal agents with DEA, who booked Defendants into state custody on state narcotics charges. Federal agents immediately read each Defendant his or her Miranda rights from a pre-printed form in his or her native language within six hours of arrest. Defendants Montes and Limon told federal agents that they each understood his rights and agreed to answer questions. Defendant Magana told federal agents that she understood her rights and invoked her right to remain silent.

1    Federal agents interviewed Defendants Montes and Limon within the 6 hour "safe harbor". As such,

2    there are no public policy concerns that are implicated by the facts of this case. Thus, the Court should

3    deny Defendants' motion to suppress statements.

4         With regard to Defendant Magana, she made spontaneous statements during the biographical

5    interview. Routine gathering of background biographical information, such as identity, age, and

6    address, usually does not constitute interrogation. United States v. Washington, 462 F.3d 1124, 1132-33

7    (9th Cir. 2006); see also United States v. Perez, 776 F.2d 797, 799 (9th Cir. 1985) (holding that there

8    was no interrogation and that Miranda warnings were not required when court asked defendant his true

9    identity because the questioning involved only routine booking information concerning the defendant's

10   identity, overruled on other grounds by United States v. Cabaccang, 332 F.3d 622, 634-35 (9th Cir.

11   2003)); United States v. Booth, 669 F.2d 1231, 1238 (9th Cir. 1981) (concluding that questions relating

12   to defendant's identity and age were not likely to elicit an incriminating response). Voluntary statements

13   are not considered the product of interrogation. Rhode Island v. Innis, 446 U.S. 291, 300 (1980). Here,

14   the voluntary statements made by Defendant Magana were not in response to any questions by federal

15   agents. After Agent Pokryfke told Defendant Magana that she should be truthful, Defendant Magana

16   freely and voluntarily stated that the only reason she "did this was because [she had] tickets to pay off."

17   Agent Pokryfke did not respond to Defendant Magana's comment. Since there was no interrogation,

18   there is no reason for the Court to suppress this statement. As such, the Court should deny Defendant

19   Magana's motion to suppress.

20        **C.    THE COURT SHOULD NOT SUPPRESS FRUITS OF A LAWFUL ARREST**

21        Defendants move to suppress all evidence as the fruits of a stop that was not supported by

22   reasonable suspicion. Defendants do not specify what evidence he or she specifically believes to be the

23   fruit of an illegal stop. As discussed below, the facts in this case overwhelmingly support a

24   determination that Border Patrol agents had a reasonable suspicion that Defendants Montes, Magana,

25   and Limon were engaged in criminal activity.

26        The Fourth Amendment prohibits "unreasonable searches and seizures" by the government and

27   the reach of that protection extends to investigatory stops of people and vehicles that fall short of arrests.

28   United States v. Arvizu, 534 U.S. 266, 273 (2002). Reasonable suspicion exists for an investigatory stop

of a vehicle when the officer is aware of specific articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that the person to be detained has committed or is about to commit a crime. See United States v. Cortez, 449 U.S. 411, 417-418 (1981); United States v. Salinas, 940 F.2d 392, 394 (9th Cir.1991).  Facts are to be interpreted in light of the experience of a trained officer, and the entirety of relevant circumstances must be considered.  United States v. Sokolow, 490 U.S. 1, 7-8 (1989).

The Supreme Court has established a non-exclusive list of factors upon which an officer may rely in concluding reasonable suspicion exists: (1) characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver, including obvious attempts to evade officers; (6) appearance or behavior of the passengers; (7) model and appearance of vehicle; and (8) officer experience.  United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975).  However, the "totality of the circumstances" of each case must be considered to determine whether the detaining officer has a particularized and objective basis for suspecting illegal activity. United States v. Arvizu, 534 U.S. 266, 273-274 (2002).  In making a reasonable-suspicion determination, reviewing courts must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.  Id. at 268.   This process allows officers to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Id. at 273.  All factors are considered including those that may be innocuous in another context. United States v. Fernandez-Castillo, 324 F.3d 1114, 1117 (9th Cir. 2003). "Reasonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form the basis for particularized suspicion."  United States v. Tiong, 224 F.3d 1136, 1139 (9th Cir. 2000) (quoting United States v. Montero-Camargo, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc)).

Here, the factors supporting reasonable suspicion to stop and detain Defendants' vehicle were numerous and compelling. The Border Patrol surveillance team conducted operations near the Shockey Truck Trail and State Route 94 and consisted of several highly experienced Border Patrol agents familiar with smuggling activity in this area with close proximity to the U.S./Mexico border.  These

agents knew how to conceal themselves and what signs to look for indicating smuggling activity. In this case, agents observed the stopping and honking along a known smuggling corridor, observed the tandem driving and communication between the Maxima and Malibu, observed the Maxima and Malibu return several times to the same area, determined that the registered owner of the Malibu was associated with a prior marijuana smuggling event, and observed the Malibu riding heavier in the rear despite having only two visible occupants in the front. Agents quickly and justifiably concluded that the Malibu was transporting contraband – either illegal aliens or narcotics. These factors are common with both drug and alien smugglers. As such, Border Patrol agents had reasonable suspicion to stop the Malibu and to search it.

Similar factors as present in the instant case were also considered by the court in United States v. Diaz-Juarez, 299 F.3d 1138 (9th Cir. 2002) in upholding the validity of a stop. In Diaz-Juarez, the court considered: (1) that the defendant was on a road at an unusual time; (2) the road was in a high crime area; (3) the road was close to the United States/Mexico border; (4) defendant's vehicle was registered out of the area; (5) the vehicle was observed slowing and speeding in a manner consistent with someone unfamiliar with the area; (6) the vehicle bounced erratically over small bumps; and (7) the suspension of the vehicle appeared to have been modified consistent with vehicles used in smuggling. Id. at 1142. Several of these factors are present in the instant case, this was a high crime area; close to the United States/Mexico border; Defendant's vehicle was registered to a known marijuana smuggler; the vehicle was riding low from the weight of the 104 pounds of marijuana concealed in the trunk.

### D.    THE COURT SHOULD NOT SEVER CO-DEFENDANTS

Rule 8(b) of the Federal Rules of Criminal Procedure specifically provides for the joinder of defendants where they participated in the same series of acts or transactions constituting an offense or group of offenses. Rule 8(b) provides that:

> The indictment . . . may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

"Co-defendants jointly charged are, *prima facie*, to be jointly tried." United States v. Mariscal, 939 F.2d 884, 885 (9th Cir. 1991), citing United States v. Doe, 665 F.2d 920, 926 (9th Cir. 1980); see also United

States v. Silla, 555 F.2d 703, 707 (9th Cir. 1977) ("compelling circumstances" generally required to show necessity of separate trial).

Where, as here, initial joinder is proper, the granting or denial of a motion for severance is governed by Rule 14(a) of the Federal Rules of Criminal Procedure. Rule 14(a) provides:

> If the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may . . . sever the defendants' trials, or provide any other relief that justice requires.

Thus, in order to justify a severance under Rule 14, the defendant bears the heavy burden of demonstrating undue prejudice.  See, eg., United States v. Arbelaez, 719 F.2d 1453, 1460 (9th Cir. 1983).  The Supreme Court has held that "when defendants have been properly joined under Rule 8(b), a district court should grant severance under Rule 14(a) only if there is a serious risk that a joint trial would prejudice a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 536 (1993).  For the reasons outlined below, defendant Bonilla's motion to sever should be denied.

### 1.     There Are No Antagonistic Defenses That Support Severance

Defendant Magana argues for severance because her co-defendants will have antagonistic and mutually exclusive defenses at trial.  Even when co-defendants present antagonistic defenses, such defenses "are not prejudicial per se." Zafiro, 506 U.S. at 538 (noting that a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence).  The Supreme Court noted that few courts have reversed convictions for failure to sever on the grounds of antagonistic defenses.  Id.

To warrant severance on the basis of antagonistic defenses, co-defendants must show that their defenses are irreconcilable and mutually exclusive.  See United States v. Angwin, 271 F.3d 786, 795-96 (9th Cir. 2001) (rejection of defense argument that ignorance is irreconcilable with a defense based on a lack of guilty intent such as duress); United States v. Sherlock, 962 F.2d 1349, 1363 (9th Cir. 1992) (mere presence of hostility among defendants or the desire of one to exculpate himself by inculpating the other does not generate the kind of prejudice that mandates severance).  Defenses are mutually exclusive when "acquittal of one co-defendant would necessarily call for the conviction of the other."

United States v. Tootick, 952 F.2d 1078, 1081 (9th Cir. 1991); United States v. Throckmorton, 87 F.3d 1069, 1072 (9th Cir. 1996) (noting that "a defendant must show that the core of the co-defendant's defense is so irreconcilable with the core of his own defense that the acceptance of the co-defendant's theory by the jury precludes acquittal of the defendant").

In Throckmorton, Throckmorton was tried with a co-defendant for conspiracy to import a controlled substance. Throckmorton moved to sever trials, as the co-defendant's defense was that he had, in fact, imported the narcotics (along with Throckmorton), but had done so under color of public authority. Throckmorton's defense was a theory of insufficiency of the evidence. The Ninth Circuit affirmed the district court's denial of the motion to sever, stating:

> It is clear [co-defendant's] defense was antagonistic to Throckmorton's. Antagonism between defenses of the desire of one defendant to exculpate himself by inculpating a codefendant, however, is insufficient to require severance. To be entitled to severance on the basis of mutually antagonistic defenses, a defendant must show that the core of the codefendant's defense is so irreconcilable with the core of his own defense that the acceptance of the codefendant's theory by the jury precludes acquittal of the defendant.

Throckmorton, 87 F.3d at 1072. See United States v. Ramirez, 710 F.2d 535, 546 (9th Cir. 1983); United States v. Brady, 579 F.2d 1121, 1129 (9th Cir. 1978); United States v. Marable, 574 F.2d 224, 231 (5th Cir. 1978). The lesson of all these cases is that the court should not grant a severance "absent clear evidence" that the defenses are truly mutually exclusive.

Under Throckmorton, Defendant Magana's motion to sever should be denied. First, Defendant Magana has made absolutely no showing regarding her defense and thus, has not shown that her defense and her co-defendants' defenses are, at their core, truly mutually exclusive. There is no reason to believe at this time that Defendants Hernandez, Montes and Limon will present a defense that will be in any way irreconcilable with Defendant Magana's defense. Thus, the acquittal of one defendant will not necessarily call for the conviction of the other, as required by the above-referenced caselaw.

## 2.   The Court Can Address Any *Bruton* Issue By Impanelment of Multiple Juries

While joint trials are preferred, not all relevant evidence may be admitted against all four Defendants. For example, Bruton v. United States, 391 U.S. 123 (1968) held that the admission of a non-testifying, codefendant's out of court confession that implicated another codefendant was violative of the Sixth Amendment's Confrontation Clause. Bruton v. United States, 391 U.S. 123, 125, 136. Despite a jury instruction given stating that the confession could only be used against the declarant, the

1   Supreme Court noted that the admission of such statement violated the petitioner's right to confront

2   witnesses as he was unable to cross-examine the declarant's statement.  Id. at 126.  To remedy such

3   problems, courts have recognized three Constitutionally sound solutions to "Bruton problems":

4   (1) redaction of any reference to a codefendant from declarant's statement; (2) severance of defendants;

5   and (3) multiple-jury procedures.[1]  It is the latter solution the United States proposes here to remedy a

6   "Bruton problem."

7        In this case, there are several statements that the United States intends to offer into evidence in

8   its case-in-chief that may implicate Bruton.  Specifically, Defendants Montes and Limon made several

9   inculpatory post-Miranda statements to agents which implicate Defendant Magana in charged offense

10  of possession with intent to distribute marijuana.  Such statements which implicate Defendant Magana

11  presented through an agent would raise Bruton problems if admitted during a single jury joint trial.

12       The United States proposes the impanelment of multiple juries as opposed to the other remedies

13  available to this Court because the majority of the witnesses and evidence are admissible and relevant

14  to all Defendants.  Except for these post-Miranda statements, the remainder of the witnesses and

15  evidence relate to and are admissible against all Defendants.  Severing this case to remedy a discrete

16  Bruton problem would be a waste of judicial resources, attorney resources and would place a heavy

17  burden on the various witnesses (some of whom are out of town) who would presumably have to testify

18  multiple times about the same subject.

19       The use of multiple juries is widely used and accepted in the Ninth Circuit.  Lambright v.

20  Stewart, 191 F.3d 1181, 1185 (9th Cir. 1999)(en banc); Beam v. Paskett, 3 F.3d 1301, 1304 (9th Cir.

21  1993); United States v. Burnette, 698 F.2d 1098, 1042, n.2 (9th Cir. 1983); United States v. Sidman, 470

22  F.2d 1158, 1167-70 (9th Cir. 1972).  Moreover, other federal courts have accepted and approved the use

23  of multiple juries.  Mack v. Peters, 80 F.3d 230, 235 (7th Cir. 1996); United States v. Alosa, 14 F.3d

24  693, 694 n.1 (1st Cir. 1994); United States v. Lebron-Gonzalez, 816 F.2d 823, 830-1 (1st Cir. 1987);

25  Smith v. DeRobertis, 758 F.2d 1151, 1152 (7th Cir. 1985); United States v. Lewis, 716 F.2d 16, 19-20

26  (D.C. Cir. 1983); United States v. Hayes, 676 F.2d 1359, 1367 (11th Cir. 1982); United States v. Rimar,

27  558 F.2d 1271, 1273 (6th Cir. 1977).  State courts routinely use dual juries.  People v Ruiz, 447 N.E.2d

28

---

[1] See 41 A.L.R.4th 1189 and 72 A.L.R. Fed. 875 each provide a detailed discussion on the use of multiple juries.

148 (Ill. 1982); <u>People v. Wardlow</u>, 118 Cal. App.3d 375 (1981); <u>People v. Brooks</u>, 92 Mich. App. 393 (1979); <u>Feeney v. State</u>, 359 So.2d 569 (Fl. 1978).

In <u>United States v. Sidman</u>, 470 F.2d at 1167-68, the Ninth Circuit approved the use of multiple juries and articulated how the district court properly conducted the trial efficiently and successfully protected each defendants' due process and trial rights.  In <u>Sidman</u>, the district court explained the purpose of two juries where each jury would decide the guilt or innocence of only one defendant, instructed each juror not to talk to each other about the case, and named one jury the "Clifford jury" and the other the "Sidman jury."  One jury sat in the jury box and the other sat in chairs in front of the jury box.  Counsel and the defendant would be present whenever testimony or evidence was presented in their respective case.  The first verdict returned was not announced until the second one was returned. The Ninth Circuit held that the dual juries used did not violate either of the defendants' trial and due process rights.

The government respectfully requests that the Court impanel separate juries with each jury to decide the case as to a particular defendant.  Given that the evidence against all Defendants is substantially similar, utilizing a dual-jury procedure would not unduly complicate the trial process or, more importantly, would not result in any specific and undue prejudice to either defendant.  Under such a procedure, the trial could be conducted as follows:

1)   Selection of separate juries for each Defendant with each jury having distinct and different colored or marked juror badges;

2)   Separate opening statements as to each defendant should either party decide to mention Defendants' post-<u>Miranda</u> statements that raise the <u>Bruton</u> problem;

3)   Presentation of evidence to multiple juries contemporaneously, except for the evidence of the post-<u>Miranda</u> statements made by Defendants Montes and Limon that raises a <u>Bruton</u> issue as to Defendant Magana.  <u>See</u> <u>United States v. Alosa</u>, 14 F.3d 693, 694 n.1 (1st Cir. 1994) (recognizing use of dual-jury procedure);

4)   Should either Defendant choose to take the stand on his or her own behalf, all juries would be present for the testimony;

5)   Instruction of the law to all juries contemporaneously;

6)   Separate closing arguments; and

7)   Separate deliberations using separate jury rooms.  Should one jury come back with a verdict, it will not be read until the other jury completes its deliberations.

/ /

1    Such a procedure is appropriate and may eliminate any risk of prejudice.  <u>DeRobertis</u>, 758 F.2d

2   at 1152; <u>see also</u> <u>Mack</u>, 80 F.3d at 235.  Accordingly, the United States requests that the Court grant the

3   United States' request to impanel separate juries.

4        **E.        THE COURT SHOULD NOT SEVER COUNTS**

5             **1.        The Counts In the Indictment Are of the Same or Similar Character**

6    Defendants argue that joinder of different defendants for different crimes is *per se* error.  [Def.

7   Magana's Motion at 15-16.]  Viewing in light of the Superseding Indictment and the facts at issue in

8   each of the counts, Defendants are incorrect.

9    As a threshold matter, joinder is appropriate under the Federal Rules.  Federal Rule of Criminal

10  Procedure 8 specifically provides for the joinder of counts where they:

11         are of the same or similar character, or are based on the same act or transaction, or are
            connected with or constitute parts of a common scheme or plan.
12
    Fed. R. Crim. P. 8(a) (emphasis added).  The Rule phrases these connectivity requirements in the
13
    disjunctive. This disjunctive phrasing means that any of the three circumstances described therein would
14
    suffice to make joinder appropriate under Rule 8(a).
15
     The Ninth Circuit's recent opinion in <u>United States v. Jawara,</u> 462 F.3d 1173 (9th Cir. 2006),
16
    affects this inquiry.  In <u>Jawara</u>, the Ninth Circuit addressed the joinder of document fraud charges
17
    relating to the defendant's personal asylum application with conspiracy to commit marriage fraud
18
    charges. <u>Id.</u> at 1176. The dates of these charges were separated by three years.  <u>Id.</u>  The Ninth Circuit
19
    concluded that:
20
           the bottom line is that the similar character of the joined offenses should be
21         ascertainable-- either readily apparent or reasonably inferred--from the face of the
            indictment. Courts should not have to engage in inferential gymnastics or resort to
22         implausible levels of abstraction to divine similarity. Thus, where the government seeks
            joinder of counts on the basis of "same or similar character," it crafts a barebones
23         indictment at its own risk.

24  <u>Id.</u> at 1185.

25   Here, to prove the elements of these two counts, the United States intends to argue that

26  Defendants knowingly possessed marijuana and Defendants each possessed marijuana with the intent

27  to deliver it to another person.  Under the facts of both cases there are similarities that intertwine the

28  offenses making the counts similar in character.  In both counts, the marijuana was seized in the same

area in Campo, California, near the Shockey Truck Trail. More importantly, there was a Google satellite

map seized from both smuggling events with similar markings (i.e., "X" marking the pickup spot) and

with the pickup points for each marijuana load being less than one-half mile apart. The marijuana in

both offenses was packaged in a nylon covering with spray painting and with improvised backpack

straps that were similar. Finally, both offenses involved a similar defendant – Defendant Montes – who

is alleged to have known the area where the marijuana was seized. As such, the instant case does not

present the facts that weigh toward severance.

## 2.    There Is No Prejudice To Defendants So Severance Is Not Warranted

The granting or denial of a motion for severance is governed by Federal Rule of Criminal

Procedure 14. Rule 14 provides in pertinent part:

> If it appears that a defendant or the Government is prejudiced by a joinder of offenses
> or of defendants in an indictment or information or by such joinder for trial together, the
> court many order an election or separate trials of counts grant a severance of defendants
> or provide whatever other relief justice requires.

Fed. R. Crim. P. 14.

In other words, Rule 14 provides that the trials may be severed when it is apparent that a joint

trial would cause impermissible prejudice. The Court's inquiry should therefore be confined to whether

joinder causes impermissible prejudice to Defendant. The burden of demonstrating impermissible

prejudice, rests with Defendant. See United States v. Vasquez-Velasco, 15 F.3d 833, 844 (9th Cir.1994).

Here, Defendants have not articulated any specific prejudice that would result from joinder of

the counts. There is a sufficient logical relationship between the joined counts, and therefore, joinder

is appropriate. See United States v. Sarkisian, 197 F.3d 966 (9th Cir. 1999); United States v. Ford, 632

F.2d 1354 (9th Cir. 1980) (holding that an instance where all the criminal activities logically fall under

the umbrella of one big plan). Joinder also allows for the trial judge's diligence in instructing the jury

on the purpose of the various types of evidence. See Sarkisian, 197 F.3d at 977. In the joined case, the

Court will no doubt tightly hold the United States to its evidentiary theory. This tight control, combined

with appropriate instructions will ensure that the jury is properly focused upon the theory of the case,

not upon any impermissible tendency argument. Thus, the Court should deny the motion to sever.

//

1    **F.    THE COURT SHOULD NOT ISSUE ANY DISCOVERY ORDERS**

2        As of the date of this Motion, the United States has produced to each Defendant approximately

3    185 pages of discovery (including reports of the arresting officers and agents, a criminal history report,

4    photographs of the car and marijuana seized) and reports containing summaries of Defendants' post-

5    arrest statements.  The United States will continue to comply with its obligations under Brady v.

6    Maryland, 373 U.S. 83 (1963), the Jenks Act (18 U.S.C. §3500 et seq.), and Rule 16 of the Federal Rules

7    of Criminal Procedure ("Fed. R. Crim. P.").  At this point the United States has received **no** reciprocal

8    discovery.  In view of the below-stated position of the United States concerning discovery, the United

9    States respectfully requests the Court issue no orders compelling specific discovery by the United States

10   at this time.  The following specific response addresses each Defendants' requests for discovery.

11       **1.    Defendant's Statements And Arrest Reports**

12       The United States has turned over a number of investigative reports, including those which

13   disclose the substance of Defendant's oral statements made in response to routine questioning by United

14   States' law enforcement officers.  If additional reports by United States' agents come to light, the United

15   States will supplement its discovery.  The United States recognizes its obligations under Fed. R. Crim.

16   P. 16(a)(1)(A) to disclose "the substance of any relevant oral statement made by the defendant, before

17   or after arrest, in response to interrogation by a person the defendant knew was a government agent if

18   the government intends to use the statement in trial."  However, the United States is not required under

19   Fed. R. Crim. P. 16 to deliver oral statements, if any, made by a defendant to persons who are not United

20   States' agents.  Nor is the United States required to produce oral statements, if any, voluntarily made

21   by a defendant to United States' agents.  See United States v. Hoffman, 794 F.2d 1429, 1432 (9th Cir.

22   1986); United States v. Stoll, 726 F.2d 584, 687-88 (9th Cir. 1984).  Fed. R. Crim. P. 16 does not require

23   the United States to produce statements by Defendant that it does not intend to use at trial.  Moreover,

24   the United States will not produce rebuttal evidence in advance of trial.  See United States v. Givens,

25   767 F.2d 574, 584 (9th Cir. 1984).

26       The United States also objects to Defendant's request for an order for production of any rough

27   notes of United States' agents that may exist.  Production of these notes, if any exist, is unnecessary

28   because they are not "statements" within the meaning of the Jencks Act unless they contain a

substantially verbatim narrative of a witness' assertions <u>and</u> they have been approved or adopted by the witness. <u>See</u> discussion <u>infra</u> Part III.A.12.; <u>see also</u> <u>United States v. Alvarez</u>, 86 F.3d 901, 906 (9th Cir. 1996); <u>United States v. Bobadilla-Lopez</u>, 954 F.2d 519, 522 (9th Cir. 1992). The production of agents' notes is not required under Fed. R. Crim. P. 16 because the United States has "already provided defendant with copies of the formal interview reports prepared therefrom." <u>United States .v Griffin</u>, 659 F.2d 932, 941 (9th Cir. 1981). In addition, the United States considers the rough notes of its agents to be United States' work product, which Fed. R. Crim. P. 16(a)(2) specifically exempts from disclosure.

### 2.    *Brady* **Material**

The United States has complied and will continue to comply with its obligations under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). Under <u>Brady</u> and <u>United States v. Agurs</u>, 427 U.S. 97 (1976), the government need <u>not</u> disclose "every bit of information that might affect the jury's decision." <u>United States v. Gardner</u>, 611 F.2d 770, 774-75 (9th Cir. 1980). The standard for disclosure is materiality. <u>Id</u>. "Evidence is material under <u>Brady</u> only if there is a reasonable probability that the result of the proceeding would have been different had it been disclosed to the defense." <u>United States v. Antonakeas</u>, 255 F.3d 714, 725 (9th Cir. 2001).

The United States will also comply with its obligations to disclose exculpatory evidence under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). Furthermore, impeachment evidence may constitute <u>Brady</u> material "when the reliability of the witness may be determinative of a criminal defendant's guilt or innocence." <u>United States v. Blanco</u>, 392 F.3d 382, 387 (9th Cir. 2004) (internal quotation marks omitted). However, the United States will not produce rebuttal evidence in advance of trial. <u>See United States v. Givens</u>, 767 F.2d 574, 584 (9th Cir. 1984).

### 3.    **Information That May Result In A Lower Sentence**

Defendant claims that the United States must disclose information affecting Defendant's sentencing guidelines because such information is discoverable under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). The United States respectfully contends that it has no such disclosure obligation under <u>Brady</u>.

The United States is not obligated under <u>Brady</u> to furnish a defendant with information which he already knows. <u>See United States v. Taylor</u>, 802 F.2d 1108, 1118 n.5 (9th Cir. 1986). <u>Brady</u> is a rule of disclosure, and therefore, there can be no violation of <u>Brady</u> if the evidence is already known to the

1  defendant.  In such case, the United States has not suppressed the evidence and consequently has no

2  <u>Brady</u> obligation.  <u>See</u> <u>United States v. Gaggi</u>, 811 F.2d 47, 59 (2d Cir. 1987).

3      But even assuming Defendant does not already possess the information about factors which

4  might affect his guideline range, the United States would not be required to provide information bearing

5  on Defendant's mitigation of punishment until after Defendant's conviction or plea of guilty and prior

6  to his sentencing date.  <u>See</u> <u>United States v. Juvenile Male</u>, 864 F.2d 641, 647 (9th Cir. 1988) ("No

7  [<u>Brady</u>] violation occurs if the evidence is disclosed to the defendant at a time when the disclosure

8  remains in value.").  Accordingly, Defendant's demand for this information is unwarranted.

9                  **4.**    <u>**Defendant's Prior Record**</u>

10      The United States has already provided Defendant with a copy of his or her criminal record and

11  related court documents, in accordance with Fed. R. Crim. P. 16(a)(1)(D).  As stated above, any

12  additional court documents will be provided to Defendant within a reasonable time after receipt from

13  the respective state court.

14                  **5.**    <u>**Any Proposed 404(b) or 609 Evidence**</u>

15      The United States has complied and will continue to comply with its obligations under

16  Rules 404(b) and 609 of the Federal Rules of Evidence ("Fed. R. Evid.").  The United States has already

17  provided Defendant with a copy of his criminal record, in accordance with Fed. R. Crim. P. 16(a)(1)(D).

18      Furthermore, pursuant to Fed. R. Evid. 404(b) and 609, the United States will provide Defendant

19  with reasonable notice before trial of the general nature of the evidence of any extrinsic acts that it

20  intends to use at trial.  <u>See</u> FED. R. EVID. 404(b), advisory committee's note ("[T]he Committee opted

21  for a generalized notice provision which requires the prosecution to appraise the defense of the general

22  nature of the evidence of extrinsic acts.  The Committee does not intend that the amendment will

23  supercede other rules of admissibility or disclosure[.]").

24      Should the United States seek to introduce any similar act evidence, pursuant to Federal Rules

25  of Evidence 404(b) and 609, it will provide Defendant with notice of its proposed use of such evidence

26  and information about such bad acts at the time the United States files its Trial Memorandum.  The

27  United States objects to Defendant's request to provide such notice three weeks before trial.

28  / /

### 6. Evidence Seized and Tangible Objects

The United States has complied and will continue to comply with Fed. R. Crim. P. 16(a)(1)(E) in allowing Defendant an opportunity, upon reasonable notice, to examine, inspect, and copy all evidence seized and/or tangible objects that are within the possession, custody, or control of the United States, and that are either material to the preparation of Defendant's defense, or are intended for use by the United States as evidence during its case-in-chief, or were obtained from or belongs to Defendant.

The United States need not, however, produce rebuttal evidence in advance of trial. See United States v. Givens, 767 F.2d 574, 584 (9th Cir. 1984).

### 7. Request for Preservation of Evidence

The United States will preserve all evidence pursuant to an order issued by this Court. The United States objects to a vague and overbroad request to preserve all physical evidence. Furthermore, the United States objects to Defendant's request that the "prosecutor be ordered to question all agencies and individuals involved in the prosecution and investigation of this case" as being vague, overbroad, and not required by any rule of law. Defendant fails to cite any legal authority to support this request.

### 8. TECS Reports

The United States objects to providing Defendant with complete vehicle and pedestrian crossing reports from the Treasury Enforcement Communications System ("TECS"). TECS reports are not subject to Fed. R. Crim. P. 16(c) because the reports are neither material to the preparation of the defense, nor intended for use by the United States as evidence during its case-in-chief. The TECS reports are not Brady material because the TECS reports do not present any material exculpatory information or any evidence favorable to Defendant that is material to guilt or punishment. If the United States intends to introduce TECS information at trial, discovery of the relevant TECS reports will be made at least by the time of the filing of its trial memorandum.

### 9. Opportunity to Weigh, View, and Photograph Contraband

As stated previously, the United States has, and will continue to comply with Fed. R. Crim. P. 16(a)(1)(C) in allowing Defendant an opportunity, upon reasonable notice, to examine, copy and inspect physical evidence which is within the possession, custody or control of the United States, and which is material to the preparation of Defendant's defense or is intended for use by the United States as evidence

in chief at trial, or were obtained from or belong to Defendant.

### 10.    DEA-7 Form

The United States will provide Defendant with the results of the Drug Enforcement Administration laboratory tests on the marijuana seized in this case pursuant to Fed. R. Crim. P. 16(F).

### 11.    Narcotics Detector Dog Information

The United States strongly objects to providing Defendant with Narcotic Detector Dog information. Defendant cites no legal ground for this request.  The interior and exterior of Defendant's vehicle was sniffed in the secondary inspection area at the border, where no probable cause or even a reasonable articulable suspicion is needed to conduct a routine search.  United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985); United States v. Vargas-Castillo, 329 F3d 715, 722 (9th Cir. 2003).  Thus, none of the information Defendant requests is relevant or discoverable.

### 12.    Expert Witnesses

The United States has complied and will continue to comply with Fed. R. Crim.  P. 16(a)(1)(G) and provide Defendant with notice and a written summary of any expert testimony that the United States intends to use during its case-in-chief at trial under Fed. R. Evid. 702, 703, or 705.  The United States objects to Defendant's request to provide such notice three weeks before trial as it is not required by any rule of law.

### 13.    Scientific and Other Information

The United States will provide Defendant with any scientific tests or examinations, in accordance with Fed. R. Crim. P. 16(a)(1)(F).

### 14.    *Henthorn* Materials

The United States has complied and will continue to comply with United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991) by requesting that all federal agencies involved in the criminal investigation and prosecution review the personnel files of the federal law enforcement inspectors, officers, and special agents whom the United States intends to call at trial and disclose information favorable to the defense that meets the appropriate standard of materiality.  See United States v. Booth, 309 F.3d 566, 574 (9th Cir. 2002) (citing United States v. Jennings, 960 F.2d 1488, 1489 (9th Cir. 1992)).   If the materiality of incriminating information in the personnel files is in doubt, the information will be submitted to the Court for an in camera inspection and review.

1    Defendant's request that the specific prosecutor in this case review the personnel files is

2    unwarranted and unnecessary. <u>Henthorn</u> expressly provides that it is the "government," not the

3    prosecutor, which must review the personnel files.   <u>Henthorn</u>, 931 F.2d at 30- 31.  Accordingly, the

4    United States will utilize its typical practice for review of these files, which involves requesting

5    designated representatives of the relevant agencies to conduct the reviews.  The United States opposes

6    the request for an order that the prosecutor personally review the personnel files.

7    **15.    Evidence of Bias or Motive to Lie / Impeachment Evidence/**
     **Evidence Affecting Perception, Recollection, Ability to**
8    **Communicate, or Truth Telling / _Giglio_ Material**

9    The United States will comply with its obligations to disclose impeachment evidence under

10   <u>Giglio v. United States</u>, 405 U.S. 150 (1972).  Moreover, the United States will disclose impeachment

11   evidence, if any exists, when it files its trial memorandum, although it is not required to produce such

12   material until after its witnesses have testified at trial or at a hearing.  <u>See</u> <u>United States v. Bernard</u>, 623

13   F.2d 551, 556 (9th Cir. 1979).

14   The United States recognizes its obligation to provide information related to the bias, prejudice

15   or other motivation of United States' trial witnesses as mandated in <u>Napue v. Illinois</u>, 360 U.S. 264

16   (1959).  The United States will provide such impeachment material in its possession, if any exists, at

17   the time it files its trial memorandum.  At this time, the United States is unaware of any prospective

18   witness that is biased or prejudiced against Defendant or that has a motive to falsify or distort his or her

19   testimony.  The United States is unaware of any evidence that any United States witness' ability to

20   perceive, recollect, communicate or tell the truth is impaired.

21   **16.    <u>Evidence of Criminal Investigation of Any United States' Witness</u>**

22   The United States objects to Defendant's overbroad request for evidence of criminal

23   investigations by federal, state, or local authorities into prospective government witnesses. The United

24   States is unaware of any rule of discovery or Ninth Circuit precedent that entitles Defendant to any and

25   all evidence that a prospective government witness is under investigation by federal, state or local

26   authorities.  Moreover, as discussed above, the United States has no obligation to disclose information

27   not within its possession, custody or control.  <u>See</u> <u>United States v. Gatto</u>, 763 F.2d 1040, 1048 (9th Cir.

28   1985); <u>United States v. Aichele</u>, 941 F.2d 761, 764 (9th Cir. 1991) (California state prisoner's files

     outside of federal prosecutor's possession); <u>United States v. Chavez-Vernaza</u>, 844 F.2d 1368, 1375 (9th

Cir. 1987) (the federal government had no duty to obtain from state officials documents of which it was aware but over which it had no actual control); cf. <u>Beaver v. United States</u>, 351 F.2d 507 (9th Cir. 1965) (Jencks Act refers to "any statement" of a witness produced by United States which is in possession of United States and does not apply to a recording in possession of state authorities).

The United States recognizes and will comply with its obligations under the rules of discovery and Ninth Circuit precedent to disclose exculpatory and impeachment information.  The United States also recognizes its obligation to provide information--if any exists--related to the bias, prejudice or other motivation of United States' trial witnesses, as mandated in <u>Napue v. Illinois</u>, 360 U.S. 264 (1959), when it files its trial memorandum.

### 17.    Witness Addresses and Names of Witnesses Favorable to the Defendant

The United States objects to Defendant's request for witness addresses.  None of the cases cited by Defendant, nor any rule of discovery, requires the United States to disclose witness addresses.  There is no obligation for the United States to provide addresses of witnesses that the United States intends to call or not call.  Therefore, the United States will not comply with this request.

The United States will produce the names of witnesses it intends to call at trial.  Defendant has already received access to the names of potential witnesses through the discovery sent to his counsel. The United States is not aware of any individuals who were witnesses to Defendant's offense except the law enforcement agentes who apprehended him.  The names of these individuals have already been provided to Defendant.

### 18.    Statements Relevant to the Defense

The United States objects to the request for "any statement relevant to any possible defense or contention" as overbroad and not required by any discovery rule or Ninth Circuit precedent.  In making this request, Defendant relies on <u>United States v. Bailleaux</u>, 685 F.2d 1105 (9th Cir. 1982), <u>overruled on other grounds by</u> <u>Huddleston v. United States</u>, 485 U.S. 681, 108 S.Ct. 1496, 1499 (1988). Defendant asserts that <u>Bailleauz</u> interprets Fed. R. Crim. P. 16 as requiring the United States to disclose "any statement relevant to any possible defense or contention" that Defendant might assert.  [Def Motion  at 6 (internal quotation marks omitted).]  However, the Ninth Circuit holding was not so broad. In fact, the Ninth Circuit, interpreting Fed. R. Crim. P. 16, held: "We believe the Government should disclose any statement <u>made by the defendant</u> that may be relevant to any possible defense or contention

that the defendant might assert." <u>See</u> <u>Bailleaux</u>, 685 F.2d at 1114 (emphasis added).  Therefore, the United States will only disclose relevant statements <u>made by Defendant</u> pursuant to this request.

### 19.    Agreements/Informants and Cooperating Witnesses

Defendant incorrectly asserts that <u>Roviaro v. United States</u>, 353 U.S. 52 (1957), establishes a <u>per se</u> rule that the United States must disclose the identity and location of confidential informants used in a case.  Rather, the Supreme Court held that disclosure of an informer's identity is required only where disclosure would be relevant to the defense or is essential to a fair determination of a cause.  <u>Id.</u> at 60-61.  Moreover, in <u>United States v. Jones</u>, 612 F.2d 453 (9th Cir. 1979), the Ninth Circuit held:

> The trial court correctly ruled that the defense had no right to pretrial discovery of information regarding informants and prospective government witnesses under the Federal Rules of Criminal Procedure, the Jencks Act, 18 U.S.C. § 3500, or <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

<u>Id.</u> at 454.  As such, the United States is not obligated to make such a disclosure, if there is in fact anything to disclose, at this point in the case.

That said, the United States is unaware of the existence of an informant or any cooperating witnesses in this case.  The United States is also unaware of any agreements between the United States and potential witnesses.  However, as previously stated, the United States will provide Defendant with a list of all witnesses which it intends to call in its case-in-chief at the time the Government's trial memorandum is filed, although delivery of such a list is not required.  <u>See</u> <u>United States v. Dischner</u>, 960 F.2d 870 (9th Cir. 1992); <u>United States v. Mills</u>, 810 F.2d 907, 910 (9th Cir. 1987); <u>United States v. Culter</u>, 806 F.2d 933, 936 (9th Cir. 1986).

### 20.    Bias by Informants or Cooperating Witnesses

As noted above, the United States recognizes its obligation under <u>Brady</u> and <u>Giglio</u> to provide material evidence that could be used to impeach Government witnesses including material information related to bias or motive to lie.

### 21.    Jencks Act Material

The United States will fully comply with its discovery obligations under the Jencks Act.  For purposes of the Jencks Act, a "statement" is (1) a written statement made by the witness and signed or otherwise adopted or approved by him, (2) a substantially verbatim, contemporaneously recorded transcription of the witness' oral statement, or (3) a statement by the witness before a grand jury. <u>See</u>

18 U.S.C. § 3500(e). Notes of an interview only constitute statements discoverable under the Jencks Act if the statements are adopted by the witness, as when the notes are read back to a witness to see whether or not the government agent correctly understood what the witness said. United States v. Boshell, 952 F.2d 1101, 1105 (9th Cir. 1991) (citing Goldberg v. United States, 425 U.S. 94, 98 (1976)). In addition, rough notes by a government agent "are not producible under the Jencks Act due to the incomplete nature of the notes." United States v. Cedano-Arellano, 332 F.3d 568, 571 (9th Cir. 2004).

Production of this material need only occur after the witness making the Jencks Act statements testifies on direct examination. See United States v. Robertson, 15 F.3d 862, 873 (9th Cir. 1994). Indeed, even material that is potentially exculpatory (and therefore subject to disclosure under Brady) need not be revealed until such time as the witness testifies on direct examination if such material is contained in a witness's Jencks Act statements. See United States v. Bernard, 623 F.2d 551, 556 (9th Cir. 1979). Accordingly, the United States reserves the right to withhold Jencks Act statements of any particular witness it deems necessary until after they testify.

### 22. Personnel Records

As discussed supra Part III.A.14., the United States will instruct all relevant agencies to review the personnel files of government witnesses for information pertaining to dishonesty or impeachment. Defendant has not cited any authority that requires the United States to produce "citizen complaints and other related internal affairs documents." [Def Motion at 7.] The case cited by Defendant, Pitchess v. Superior Court, 11 Cal.3d 531, 539 (1974) has been superceded by statute. See Fagan v. Superior Court, 111 Cal. App.4th 607 (2003). Moreover, Pitchess involved a criminal case in which a defendant who claimed to have acted in self-defense sought evidence as to the police officers' use of force on previous occasions. Pitchess, 11 Cal. 3d at 534, 535. Pitchess is simply inapplicable to Defendant's case.

### 23. Training of Relevant Law Enforcement Officers

The United States strenuously objects to providing to Defendant a copy of all policies, training instructions, and manuals issued by all law enforcement agencies involved in this case. The requested policies, training instructions, and manuals are irrelevant and do not fall within the scope of Fed. R. Crim. P. 16, or any other statutory or Constitutional disclosure provision. Even if one or more of the inspectors, officers, or special agents violated his or her own administrative regulations, guidelines, or procedures, such violations would not result in the exclusion of evidence if Defendant's Constitutional

1  and statutory rights were not violated in this case.  United States v. Caceres, 440 U.S. 741, 744 (1979);

2  United States v. Hinton, 222 F.3d 664 (9th Cir. 2000).

3  **24.    Performance Goals and Policy Awards**

4  The United States strenuously objects to providing Defendant with information regarding the

5  agency standards used for measuring, compensating, or reprimanding the conduct of all law enforcement

6  officers involved in this case.  The requested information regarding the agency standards used for

7  measuring, compensating, or reprimanding the conduct of the law enforcement officers is irrelevant and

8  does not fall within the scope of Fed. R. Crim. P. 16, exculpatory evidence under Brady, impeachment

9  evidence under Giglio, or any other authority governing disclosure

10  **25.    Residual Request**

11  As indicated, the United States will comply with its discovery obligations in a timely manner.

12  **G.    THE COURT MAY GRANT DEFENDANTS' MOTIONS FOR JOINDER**

13  The United States does not oppose Defendants' motion to join co-defendants motions.

14  **H.    THE COURT MAY GRANT LEAVE TO FILE FURTHER MOTIONS**

15  The United States does not oppose Defendants' request to file further motions if they are based

16  on new discovery or other information not available to Defendant at the time of this motion hearing.

17  **IV**

18  **CONCLUSION**

19  For the foregoing reasons, the United States requests the Court deny Defendant's Motions to

20  Dismiss the Indictment under *County of Riverside*, Suppress Statements, Suppress Fruits of an Unlawful

21  Arrest, Sever Co-Defendants, Sever Counts, Compel Discovery and Preserve Evidence, Joinder and

22  Leave to File Further Motions, unless unopposed.

23  DATED: June 18, 2008

24  Respectfully submitted,

25  KAREN P. HEWITT
   United States Attorney

26

27  /s/ *Joseph J.M. Orabona*
   JOSEPH J.M. ORABONA
   Assistant United States Attorney

28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal Case No. 08CR1166-W |
| | ) | |
| Plaintiff, | ) | |
| | ) | **CERTIFICATE OF SERVICE** |
| v. | ) | |
| | ) | |
| FELIX HERNANDEZ-CHAVEZ (1), | ) | |
| HUGO MONTES-MARTINEZ (2), | ) | |
| MODESTA LUISA MAGANA (3), | ) | |
| JUAN JESUS LIMON (4), | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

IT IS HEREBY CERTIFIED that:

I, Joseph J.M. Orabona, am a citizen of the United States and am at least eighteen years of age.  My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action.  I have caused service of the United States' **Response in Opposition to Defendants' Discovery Motions, Motion to Dismiss the Indictment, Motions to Suppress, Motions to Sever, Motion for Joinder, and Motion to File Further Motions** together with a **Statement of Facts and Memorandum of Points and Authorities** on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

| | |
|---|---|
| 1. L. Marcel Stewart<br>   Law Office of L. Marcel Stewart<br>   121 Broadway, Suite 349<br>   San Diego, California 92101<br>   Tel:  (619)702-4123<br>   Email: lmslaw@att.net<br>   *Lead Attorney for Defendant Hernandez* | 2.    Elizabeth Barros<br>       Federal Defenders of San Diego, Inc.<br>       225 Broadway, Suite 900<br>       San Diego, California 92101<br>       Tel: (619) 234-8467<br>       Email: elizabeth.barros@fd.org<br>       *Lead Attorney for Defendant Montes* |
| 3. Timothy Scott<br>   Law Office of Timothy Scott<br>   1350 Columbia Street<br>   San Diego, California<br>   Tel: (619) 794-0451<br>   Email: timscottlaw@cox.net<br>   *Lead Attorney for Defendant Magana* | 4.    Michael E. Burke<br>       Law Office of Michael Burke<br>       105 West F Street, 4th Floor<br>       San Diego, California<br>       Tel: (619) 234-2503<br>       Email: burkelaw1@sbcglobal.net<br>       *Lead Attorney for Defendant Limon* |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 18, 2008.

/s/ *Joseph J.M. Orabona*
JOSEPH J.M. ORABONA
Assistant United States Attorney